# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

Shawn F. Mortensen,                                Civil No. 10-4976 (JRT/JJG)

             Plaintiff,

v.                                                              REPORT AND RECOMMENDATION

Michael J. Astrue,
Commissioner of Social Security,

             Defendant.

_____

JEANNE J. GRAHAM, United States Magistrate Judge

Plaintiff Shawn F. Mortensen seeks judicial review of the administrative denial of his application for Social Security disability insurance benefits and supplemental security income. The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b) and is presently before the Court on cross-motions for summary judgment.

Plaintiff asserts three points of error by the Defendant Commissioner of Social Security: that the Administrative Law Judge (ALJ) failed to consider appropriate medical evidence in determining Plaintiff's residual functional capacity profile, specifically that the ALJ did not give probative weight to Plaintiff's Global Assessment of Functioning scores; that the ALJ erred by giving weight to selective statements from Plaintiff's treating psychiatrist while ignoring his dispositive statements; and that the ALJ erred in determining Plaintiff's credibility by attributing his failure to take medicine to Plaintiff's conscious decision, rather than the mental illness itself. For the reasons stated below, the Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

## I.      BACKGROUND

Plaintiff filed for disability insurance benefits (DIB) and supplemental security income (SSI) on January 22, 2007, alleging he became disabled on January 1, 2003.[1] (R. at 9.) Plaintiff's application for benefits alleged both physical and broad mental illnesses. (*Id.* at 11-13.) Plaintiff's claims were denied on May 24, 2007 and upon reconsideration on August 27, 2007. (*Id.*) Plaintiff then requested a hearing. (*Id.*) The ALJ determined that Plaintiff was not disabled and, therefore, not eligible for DIB or SSI. (*Id.* at 18.)

### A.      Scope of Medical Records Review

Generally, the Court would begin its review of Plaintiff's medical records with the alleged disability onset date in 2003. However, in this case, the Court begins its review of the medical evidence after the last denial of disability benefits. *See Gavin v. Heckler*, 811 F.2d 1195, 1200 (8th Cir. 1987) (applying the doctrine of collateral estoppel to SSI claims; denying subsequent review of evidence offered in a finally determined application). Plaintiff filed a separate application for SSI in August 2003. (R. at 9.) The Commissioner's denial of that application became final on July 14, 2005 (*id.* at 45-65), therefore review of the file begins on July 15, 2005. While some evidence of Plaintiff's prior medical issues prior to July 14, 2005 are relevant in that they shape his current medical state, the Court will discuss that evidence only as necessary.[2]

---

[1] The administrative record refers to four failed applications for benefits: in 2001, 2002, and twice in 2003. (*Id.* at 714.) The record before the Court contains two administrative orders denying benefits. One of the orders stems from his 2003 application and the other from the application presently before the Court.

[2] For example, in his brief, Plaintiff states that approximately four years ago, he was hospitalized at Miller-Dwan Hospital in Duluth, and that three years ago, he ran over his ex-girlfriend's new boyfriend. Upon reviewing the record, however, the Court notes that those events actually occurred in 2004 and 2005, seven and six years ago, respectively.

Further, despite the application's alleging both physical and mental impairments, Plaintiff presently addresses only flaws in the ALJ's consideration of Plaintiff's mental impairments. Because Plaintiff has not objected to the ALJ's decision concerning his physical condition, those arguments are waived. *See Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010) (applying the doctrine of waiver to claims in SSI cases); *see also Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997) (requiring a showing of manifest injustice to review previously waived issues). This Court, then, will review the relevant medical evidence related to Plaintiff's mental impairments beginning July 15, 2005.

### B.      Relevant Medical Records

Plaintiff has a history of mental health problems dating back to when he was five years old. (R. at 109.) Plaintiff's application for benefits included numerous references to his mental disabilities ranging from "[Attention Deficit Disorder] since age 5" (*id.*), to suicidal ideation, depressive disorder, anger issues, and borderline intellectual functioning later in life (*id.* at 827). Plaintiff's mental ailments have manifested themselves through suicide attempts and explosive fits of destructive behavior. (*Id.* at 556, 614.)[3]

In an effort to quantify Plaintiff's overall mental well-being, doctors, and the parties here, utilized Plaintiff's Global Assessment of Functioning (GAF)[4] scores. (*Id.* at 615, 686, 710, 769, 794, 867, 911, 1067.)[5] Over the span of six years of medical records in the administrative record,

---

[3] Many of these instances occurred prior to Plaintiff's current application for benefits, but they are helpful in illustrating the effect his mental illness has had on his life.

[4] GAF scores are a reflection of the examining clinician's personal assessment of an individual's social, occupational, and psychological functioning. *Diagnostic and Statistical Manual of Mental Disorders*, 32-33 (4th ed., Am. Psychiatric Ass'n 1994) (DSM-IV-TR).

[5] GAF scores of 41-50 indicate serious symptoms or any serious impairment in societal, occupational, or school functioning. DSM-IV-TR, at 32. GAF scores of 31-40 indicate an impairment in reality testing or communication or  major impairment in several areas. *Id.* GAF scores of 21-30 indicate that one's behavior is considerably influenced by delusions or

Plaintiff had eight GAF scores ranging from 21 to 52, many of which Plaintiff received before his previous denial of benefits. (*Id.*) Since 2005, Plaintiff received GAF scores of 40, 48, 21, and 40. (*Id.* at 686, 710, 769, 794.)

In November 2005, after Plaintiff's previous application for benefits was denied, he resumed seeing a physician he had not seen in two years, Dr. Timothy Egan, M.D.[6] (*Id.* at 653.) Dr. Egan noted that, in addition to a normal, positive mental status examination, it seemed as if Plaintiff was there for "some stimulants . . . in addition to an application for Social Security Disability Income." (*Id.*) In Dr. Egan's opinion, Plaintiff was "well-developed, well-nourished . . . alert, cooperative and oriented to all spheres." (*Id.*) Dr. Egan noted, however, Plaintiff was suffering from attention deficit/hyperactivity disorder (ADHD) and other unspecified learning disorders. (*Id.*) Overall, Dr. Egan's assessment of Plaintiff's mental health was positive and optimistic.

The next record of any treatment by Dr. Egan is dated April 2006, even though the notes indicate a meeting in January 2006. (*Id.*) Dr. Egan observed that Plaintiff was "alert, cooperative and oriented to all spheres. . . . Thought processes are logical, goal directed and without evidence of disorder. There is no evidence of delusions or hallucinations. Immediate recall, recent memory, and remote memory are intact. Insight and judgment are intact. [Plaintiff] is neither homicidal nor suicidal." (*Id.* at 652.) Dr. Egan characterized Plaintiff as a "well-developed, well-nourished man in no acute distress." (*Id.*) At this meeting, Dr. Egan noted Plaintiff's self-

---

hallucinations or serious impairments in communications or judgment in almost all areas. *Id.* These numbers are assigned pursuant to the examining clinician's opinion.

[6] Dr. Egan treated Plaintiff prior to his first denial of SSI benefits. Dr. Egan's opinion in 2004 as to Plaintiff's employment prospect was that he was "clearly not going to be capable of maintaining competitive employment" based on "significant psychiatric difficulties including attention deficit hyperactivity disorder, depressive disorder, psychotic features and borderline intellectual functioning." (*Id.* at 827.)

reported complaints of forgetfulness, inattention to detail, distractibility, and other symptoms of hyperactivity. (*Id.*) Dr. Egan, however, did not report noticing these habits or traits. (*Id.*) In fact, Dr. Egan remarked that Plaintiff's "[i]mmediate recall, recent memory, and remote memory" were intact. (*Id.*) Plaintiff explicitly denied signs of depression and psychotic features at that time. (*Id.*)

Six months later, in October 2006, Plaintiff again visited Dr. Egan. (*Id.* at 651.) At this meeting, Plaintiff again denied any symptoms of depression or mania. (*Id.*) Dr. Egan remarked, however, that "[Plaintiff] has really been quite irresponsible with most of his medical care and now wants to get on SSI." (*Id.*) Dr. Egan's mental status examination at this time was still positive and optimistic. (*Id.*)

In February 2007, the next time Plaintiff saw a mental health professional, Carolyn Dinneen, M.S.W., he visited Range Mental Health Center's one-hour Diagnostic assessment as a "crisis walk-in." (*Id.* at 684-87.) This record indicates that Plaintiff entered complaining "he was depressed and suicidal." (*Id.* at 684.) The record also indicates that Plaintiff explained his temper problem dating back to childhood and gave a vague mental health history. (*Id.*) Plaintiff admitted that he would like to be on SSI and that he had applied four times but had been denied each time. (*Id.*)

In explaining his temper problems to Dinneen, Plaintiff described three specific outbursts of anger. (*Id.* at 685.) He described episodes in which he whipped a teacher with a microphone cord in school, poured hot grease on a fellow employee at Burger King, causing serious burns, and used a car to run his ex-girlfriend's new boyfriend over. (*Id.*) Despite Plaintiff's account of explosive, violent behavior, Dinneen noted that Plaintiff does "warn people before he hurts

them," and Plaintiff "considered hitting [someone who angered him] in the head with a hammer, but left the situation instead."[7] (*Id.*)

In her report, Dinneen noted Plaintiff's complaints of memory problems but commented that "he was extremely clear about the details and specifics of when and where he had [traffic] tickets, the numbers, and the final outcomes." (*Id.* at 686.) In the summary of her evaluation, Dinneen commented on Plaintiff's politeness, openness, and self-disclosing, cooperative, and oriented presentation. (*Id.*) He appeared cheerful, upbeat, and positive, denying anxiety or panic symptoms and denying current suicidal intent, despite his chief complaint of being depressed and suicidal. (*Id.*)

In April 2007, Plaintiff was assessed by Steven Carter, Psy.D. (*Id.* at 703-711.) Carter comprehensively assessed Plaintiff's condition and discussed a wide range of Plaintiff's abilities from his living situation and self-care skills to household chores and recreational activities. (*Id.*) The assessment indicated obvious problems with Plaintiff's ability to perform daily activities, but also included evidence that Plaintiff was a capable, albeit of below-average intelligence, young man. (*Id.*) For example, while Plaintiff was evaluated to have complete independence in toileting, he reported that he occasionally forgot to wipe after using the bathroom. (*Id.* at 707.) On the other hand, Plaintiff did his own grocery shopping, vacuumed his trailer once each week, did his own laundry, and cooked easy items. (*Id.*) Dr. Carter's evaluation also indicated that Plaintiff failed to adequately brush his teeth, dress for the weather, and consistently take his medicine. (*Id.* at 709.)

Dr. Carter stated that while Plaintiff complained of serious problems paying attention and being easily distracted, he did not observe Plaintiff being distracted during the assessment,

---

[7] Seventeen months later, Plaintiff reiterated that he leaves situations when he notices he is getting angry to avoid hurting others. (*Id.* at 785.)

despite the "numerous back ground [sic] noises in the clinic during his evaluation." (*Id.*) Finally, Plaintiff "reported only occasional symptoms of impulsivity although [his] history would suggest that he is under reporting in this area." (*Id.*) Dr. Carter also remarked that Plaintiff's recall and attention span were poor and that he had very impulsive judgment, assigning him a GAF score of 48. (*Id.* at 709-10.) A GAF score of 48 indicates serious symptoms. (*Id.* at 710.) Dr. Carter also noted problems with concentration and persistence, but not severe enough that Plaintiff could not work near other people. (*Id.*) Dr. Carter concluded that Plaintiff had poor social interaction abilities and poor ability to respond appropriately to unruly, demanding, or disagreeable customers or co-workers. (*Id.*) On the aggregate, Dr. Carter opined that Plaintiff could understand short, simple repetitive tasks and work in the proximity of others without being distracted. (*Id.* at 710.) More complex tasks, however, would be "beyond his abilities." (*Id.*)

In May 2007, Plaintiff saw Dr. Emery Ulrich for follow-up appointment. (*Id.* at 690.) Plaintiff explained recent anger management problems and complained about financial troubles. (*Id.*) Plaintiff also confessed to Dr. Ulrich that "[h]is ambition is now to get on SSI to help him pay bills." (*Id.*) Plaintiff explained that sometimes he made suicidal threats to bolster his SSI case, hoping he would have a heart attack in an effort to strengthen his SSI case. (*Id.*) In an effort to induce a heart attack, Plaintiff admitted to eating two pounds of bacon in a day. (*Id.* at 710-11.) Dr. Ulrich commented: "According to [Plaintiff], his symptoms have gotten much worse when he was attempting to build a case for SSI." (*Id.* at 711.) Dr. Ulrich opined that Plaintiff "probably has limited coping abilities and somehow or other he . . . [is] attempting to get on SSI and [he is] willing to do anything to appear sick." (*Id.*) In general, Dr. Ulrich's consultation indicated a strong distrust of Plaintiff's version of his condition.

Later in May 2007, Dr. Ellen Rozenfeld, Psy.D., calculated Plaintiff's Residual Functional Capacity (RFC). (*Id.* at 733.) Dr. Rozenfeld indicated that Plaintiff participates in a "fairly full range of [activities of daily living] including driving, food preparation, laundry and household chores." (*Id.* at 733.) Dr. Rozenfeld provided an opinion on Plaintiff's adaptation, social interaction, sustained concentration and persistence, and understanding and memory. (*Id.* at 731-732.) In each subcategory, Dr. Rozenfeld noted that Plaintiff had either no significant limitation or moderate limitation. (*Id.*) Plaintiff did not score in the "Markedly Limited" category on any of the subcategories. (*Id.*) She also echoed the contradiction found in Dr. Egan's medical notes, stating that "[d]espite complaints of forgetfulness, ease of distraction and poor concentration, he has normal [mental status evaluations] at the treating source appointments." (*Id.* at 733.)

Plaintiff was treated at a mental health clinic in April 2008 due to his pervasive anger problems. (*Id.* at 767.) Stephen Taylor, M.A., was the licensed psychologist who evaluated Plaintiff. (*Id.* at 769.) Taylor observed that Plaintiff was not insightful and his "judgment in lieu of his acknowledged anger management history would be poor." (*Id.* at 768.) He also noted Plaintiff's brief hospitalization at Miller-Dwan, a psychiatric hospital, as well as several 72-hour-holds for suicidal ideation. (*Id.*) Taylor assigned a GAF score of 21, indicative of a serious impairment or behavior marked by delusions or hallucinations. (*Id.* at 769.) Despite the low GAF score, Taylor commented that Plaintiff's thought content seemed intact and his intellectual abilities would probably be in the low average range. (*Id.* at 768.)

Plaintiff was evaluated next by Range Medical Center after referral by Mr. Taylor in June 2008. (*Id.* at 784.) After putting Plaintiff through a rigorous battery of psychological tests, Dr. Michaela M. Mayfield, Ph.D. and Dr. Craig Stevens, Ph.D. determined that Plaintiff was

consistently in "Low Average" or "Below Average" ranges. (*Id.* at 787-90.) Drs. Mayfield and Stevens assessed Plaintiff's full-scale IQ at 87, in the middle of the "Low Average" range of intellectual functioning. (*Id.* at 787.) Plaintiff's biggest downfall, consistent with the rest of his medical records, was his Working Memory Index, scoring in the Borderline range. (*Id.* at 788.) Scoring in this range is common for individuals with attention problems. (*Id.*) The doctors opined that Plaintiff's IQ scores, while below his intellectual functioning, did not represent a significant difference. (*Id.* at 789.) The doctors also indicated that Plaintiff struggles with self-awareness, memory, and general "orderliness." (*Id.* at 790-91.)

At least one of Plaintiff's psychological test results varied such that the outcome was invalid and incapable of interpretation. (*Id.* at 791.) Drs. Mayfield and Stevens opined that the results varied because Plaintiff "was embellishing the severity and extent of his symptoms. . . . [I]t is unclear if the individual was attempting to ensure that treatment providers knew how much he is struggling or if he was attempting to appear worse for other reasons." (*Id.*) The concern regarding embellished test answers was enhanced by Plaintiff's statement to Dr. Mayfield and Dr. Stevens that "he may have been doing those things 'for attention,'" with regard to his attempts to kill himself by overdosing on aspirin and drinking small amounts of radiator fluid. (*Id.* at 792.)

In December 2008, Plaintiff reported that he was doing "pretty good" and had been experiencing depression less often – one or two times per week. (*Id.* at 774.) Plaintiff attributed his decreased anger to his psychiatric medication regimen, with which he had been compliant. (*Id.*) Plaintiff had developed a number of strategies to help himself remember to take medicine. (*Id.*) Plaintiff was aware of his upcoming appointments and had not harmed himself physically in

the recent past. (*Id.*) Plaintiff saw myriad mental health professionals and, per Plaintiff's reports, prescribed medication lessened the effects of his depressive symptoms. (*Id.* at 17.)

Plaintiff has an extensive history of over-reporting symptoms. In fact, Plaintiff was diagnosed with hypochondriasis in May 2008.[8] (*Id.* at 742.) In December 2005, Plaintiff went to the emergency room because of nausea and diarrhea. (*Id.* at 641-42.) The emergency doctor noted, "the more I talk to him the more aches and pains he identifies." (*Id.* at 642.) Plaintiff has repeatedly alleged that his diabetes contributes to his disability, but Plaintiff has not been diagnosed with diabetes. (*Id.* at 16, 373, 573, 667.) Instead, Plaintiff checks his blood sugar levels with his deceased grandmother's blood sugar meter. (*Id.* at 16, 573.) Doctors have advised Plaintiff to stop checking his blood sugar levels and recorded low, normal blood sugar levels. (*Id.* at 573, 667.) Plaintiff was concerned he had lung cancer, despite his denial of ever using tobacco products. (*Id.* at 786.) Plaintiff was convinced he had a sexually transmitted disease, despite the lack of symptoms and sexual activity. (*Id.* at 811.) Plaintiff was also concerned he may have Fetal Alcohol Syndrome, despite any diagnosis to that effect. (*Id.* at 684.)

### C.   Administrative Proceedings

Plaintiff filed his application for benefits on January 22, 2007 with a disability onset date of January 1, 2003. (R. at 270.) The Commissioner denied Plaintiff's claims initially on May 24, 2007 and upon reconsideration on August 27, 2007. (*Id.* at 9.) Plaintiff requested a hearing before an ALJ on September 21, 2007. (*Id.*)

---

[8] Hypochondriasis, as defined in DSM-IV-TR, includes feelings that one has a serious disease based on a misinterpretation of one or more bodily signs and an unwarranted fear or idea of having a disease that persists despite medical reassurance. DSM-IV-TR, at 504.

The ALJ held a hearing on September 14, 2009 to determine whether Plaintiff was eligible for DIB and SSI. (*Id.* at 21-44.) Plaintiff, his social worker, Randy Elkington, medical expert Andrew Steiner, and Kenneth Ogren, a vocational expert, testified at the hearing. (*Id.*)

Plaintiff had some difficulty following directions at the hearing. Specifically, the ALJ had to ask Plaintiff repeatedly to use "yes" or "no" answers and to speak up so the ALJ could hear him. (*Id.* at 22, 25, 29.) Further, Plaintiff had difficulty testifying consistently and clearly. (*Id.* at 26.) For example, he admitted he cooked but explained he burned his food (*Id.*) He also struggled to quantify how much he drove and how often he saw friends. (*Id.*) In general, Plaintiff's testimony demonstrated some impairment with his mental capacity.

Elkington testified regarding the extent of assistance he provided to Plaintiff. Elkington visited Plaintiff approximately twice per week and took Plaintiff to appointments. (*Id.* at 37.) Elkington also assisted Plaintiff with paying bills and other "daily business." (*Id.* at 36-37.) Elkington testified as to his first-hand knowledge of Plaintiff's memory and concentration issues. (*Id.* at 38.) Elkington also noted Plaintiff's difficulty in certain social settings, but he acknowledged that Plaintiff did interact with friends. (*Id.*) Plaintiff indicated that he drove to his appointment with Dr. Carter and that he could drive himself for 1-2 hours. (*Id.* at 707). Elkington, however, testified at the administrative hearing that he took Plaintiff to his appointments. (*Id.* at 37.) Finally, Elkington described a time at which Plaintiff started banging his head against a table in a meeting with his probation officer because Plaintiff could not explain himself fully. (*Id.* at 39.)

Dr. Steiner and Mr. Ogren testified regarding Plaintiff's medical condition and his daily life, respectively. Dr. Steiner's opinion is irrelevant because his opinion only concerned *non*psychiatric impairments (*id.* at 41), and judicial review is limited in scope to Plaintiff's

mental impairments. Ogren testified that Plaintiff could perform light, unskilled work as a packager. (*Id.* at 42.) The job Ogren described would not require contact with the public or fellow workers, and it would not require Plaintiff to be responsible for the safety of others. Those job characteristics coincided with the ALJ's conclusions as to Plaintiff's abilities. (*Id.* at 42-43.) Ogren did not testify regarding any hypothetical individuals in a position similar to that of Plaintiff.

The ALJ found that Plaintiff was not disabled in a written decision on October 19, 2009. (*Id.* at 6-18.) Per 20 C.F.R. § 404.1520(a) and § 416.920(a), the ALJ engaged in the five-step sequential evaluation procedure promulgated by the Social Security Administration. The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2006 and had not engaged in substantial gainful activity. (*Id.* at 11.)

The ALJ next found that Plaintiff had the following severe impairments: status post C-1 fracture; lower back pain; impulse control disorder, not otherwise specified (NOS); depressive disorder, NOS; ADHD; and personality disorder with antisocial and borderline features. (*Id.*) The mental impairments listed by the ALJ were nearly identical to Dr. Egan's conclusions. The ALJ did not, however, find an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 12.) Specifically, the ALJ concluded that the back and neck pain did not equal Listing 1.04 and the mental impairments, singly or in combination, did not meet the criteria of Listings 12.02 or 12.08. (*Id.*) The ALJ undertook a thorough explanation of his thought process in arriving at the conclusion that Plaintiff's symptoms did not meet the Listings. (*Id.*)

The ALJ then engaged in a discussion of Plaintiff's RFC. (*Id.* at 14.) The ALJ concluded that, upon consideration of the entire record, Plaintiff had the RFC to perform light work as

defined in 20 C.F.R. § 404.1576(c) and § 416.967(c), excepting occasional stooping, bending, and crouching. (*Id.*) The ALJ noted that, while the "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's statements were "not credible to the extent they are inconsistent with the above residual capacity assessment." (*Id.* at 15.) Because Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible, the ALJ relied on other evidence in the record. (*Id.*)

In sorting through Plaintiff's medical records and assigning an RFC based on Plaintiff's physical limits, the ALJ assigned great probative weight to the impartial medical expert, Dr. Andrew Steiner. (*Id.*) After addressing Plaintiff's physical impairments, the ALJ disagreed with the state agency medical consultants and accordingly downgraded Plaintiff's RFC from "medium exertional level work," the level recommended by the state consultants, to "light exertional level work." (*Id.* at 16.)

The ALJ moved next to an assessment of Plaintiff's mental disabilities. In evaluating Plaintiff's mental impairments, the ALJ first discussed Dr. Steven Carter's assessment. (*Id.*) The ALJ assigned "great probative weight" to Dr. Carter's analysis because it was "consistent with the weight of the objective medical findings." (*Id.*) Dr. Carter opined that Plaintiff "could carry out short, simple, repetitive tasks despite some problems with concentration and persistence." (*Id.*) Dr. Carter did suggest, however, that Plaintiff's contact with others be limited due to Plaintiff's "poor ability to interact appropriately with customers or the public." (*Id.*)

The ALJ undertook a discussion of Plaintiff's treating psychiatrist's findings. The ALJ discussed Dr. Egan's evaluation by contrasting what Plaintiff said with what Dr. Egan observed, and by documenting Plaintiff's claims that he would like to "get on SSI." (*Id.*) For example, the ALJ noted at the outset that Dr. Egan stated that Plaintiff had "vague complaints, almost as a

preclude [sic] to an application for Social Security Disability." (*Id.*) The ALJ recounted significant evidence that Plaintiff's medication effectively reduced his feelings of depression and his irritability. (*Id.*at 17.)

The ALJ remarked that other evidence existed in the record, apart from Dr. Egan's conclusions, to raise the presumption that Plaintiff's actions were calculated to increase the likelihood of success in a claim for SSI. In addition to the aforementioned diagnosis of hypochondriasis and other instances of exaggerated symptoms, Plaintiff admitted to another of his clinicians that "he wants to start seeing 'doctors more so [he] can have records that [he] sees people so they will give [him] disability." (*Id.* at 17, 668, 781.) Based on these statements, and other statements in the record, the ALJ found Plaintiff to be "not entirely reliable."[9] (*Id.* at 18.)

The ALJ concluded that the "residual functional capacity assessment is supported by the objective medical evidence, Dr. Steiner's testimony, claimant's testimony and his reports to his treating providers." (*Id.* at 18.) The ALJ credited the Vocational Expert's testimony and found that Plaintiff was capable of working as a packager. (*Id.*) The ALJ determined Plaintiff not to be disabled. (*Id.*) Plaintiff appealed, and the Appeals Council denied review. (*Id.* at 1-3.) The ALJ's ruling is the Commissioner's final decision.

## II.     STANDARD OF REVIEW

To receive Social Security disability benefits, an individual must be disabled. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *Martonik v. Heckler*, 773 F.2d 236, 238 (8th Cir. 1985). The burden of proving disability is on the plaintiff at each phase of the inquiry. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

---

[9] This finding corresponds with Dr. Rozenfeld's determination that Plaintiff was "partially credible" and Dr. Jake's Powell presumption that Plaintiff was exaggerating symptoms. (*Id.* at 668, 727.)

On review of an ALJ's decision denying disability benefits, a court examines the administrative record to determine whether the ALJ's findings are "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). Substantial evidence in the record is "more than a mere search for the existence of evidence supporting the Commissioner's decision." *Bauer v. Soc. Sec. Admin.*, 734 F. Supp. 2d 773, 799 (D. Minn. 2010) (Kyle, J.) (citations omitted). Indeed, "[s]ubstantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* It is less than a preponderance, though. *Id.*

Review is not de novo. *Leitzke v. Callahan*, 986 F. Supp. 1216, 1224-25 (D. Minn. 1997) (Tunheim, J.) (illustrating the deference to the ALJ's factual determinations). This Court may not reverse the Commissioner's decision simply because this Court would have reached a different conclusion had it been sitting as the finder-of-fact. *Bauer*, 734 F. Supp. 2d. at 799 (citing *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995)). There is a "zone of choice" in which two fact-finders can reach inconsistent results and not be subject to reversal on appeal. *Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 954 (D. Minn. 2010) (Tunheim, J.).

## III.   DISCUSSION

Plaintiff contends that the ALJ erred in three respects. First, Plaintiff asserts that the ALJ neglected to apply all the appropriate medical evidence and did not include, or consider, all of Plaintiff's mental impairments or GAF scores. Plaintiff next argues that the ALJ failed to properly weigh Plaintiff's treating physician's opinions. Finally, Plaintiff claims that the ALJ incorrectly concluded that Plaintiff's failure to comply with his medical regimen was a conscious decision, negatively affecting his credibility, rather than a result of Plaintiff's mental impairment. In examining the ALJ's findings, this Court has considered all relevant evidence, as well as the

inferences and implications of that evidence, to determine what constitutes substantial evidence in the record as a whole. The Court will address Plaintiff's claims of error in turn.

### A.    Assessment of Plaintiff's Mental Impairments

Plaintiff's first contention is that the ALJ failed to take into account all of Plaintiff's mental impairments in determining his ability to work. Indeed, Plaintiff makes a broad argument that the ALJ ignored and failed to consider all of the appropriate medical evidence, and, therefore, did not include all of Plaintiff's mental impairments in his assessment. Plaintiff's discussion of the medical evidence is limited to Plaintiff's GAF scores, however, and the Court will limit its analysis accordingly. To support his contention, Plaintiff argues that the ALJ's failure to consider GAF scores, combined with Plaintiff's low GAF scores, necessitates a finding of disability.

An ALJ need not discuss every piece of evidence a claimant offers. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Further, "failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* A claimant's GAF score is not dispositive of his or her ability to work; GAF scores are one factor in the determination. *See Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) (maintaining that the claimant's GAF score alone indicated one conclusion, but the record on the whole indicated another). On the contrary, the Commissioner considers all relevant evidence in determining whether a claimant is disabled. 20 C.F.R. § 404.1527(b) ("[W]e will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive.")

Plaintiff relies on *Brueggeman v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003), in which the Eighth Circuit endorsed the use of GAF scores and concluded that the claimant, with a GAF

score of 50, was unable to work. The Eighth Circuit has endorsed, but not required, the use of GAF scores. *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010). Additionally, *Brueggeman* on its own does not stand for the proposition that any claimant with a GAF score of 50 or below is disabled, per se. In fact, the court in *Brueggeman* simply noted that the vocational expert in the context of *that* case "considered a claimant with a GAF score of 50 unable to find any work." *Brueggeman*, 348 F.3d at 695. The Eighth Circuit did not assign any special significance or weight to the plaintiff's GAF score other than to say that it was one piece of relevant medical evidence embedded in over "a year's worth of frequent interaction" with that claimant. *Id.*

In addition to Plaintiff's citation to *Brueggeman*, he relies on *Pate-Fires v. Astrue*, another case in which the Eighth Circuit reversed the ALJ's decision and the claimant had low GAF scores. 564 F.3d 935, 944 (8th Cir. 2009). In *Pate-Fires*, the Eighth Circuit considered the plaintiff's appeal and noted that the plaintiff had twenty-one GAF scores over a six-year period, eight of which came within two weeks of one another. *Id.* In analyzing the plaintiff's GAF scores, the court remarked that her history of GAF scores below 50 indicated that she had serious symptoms or serious impairment in social, occupational, or school functioning. *Id.* (citing DSM-IV-TR at 32). In the following paragraph, however, the court noted that the record, as a whole and notwithstanding the plaintiff's GAF score of 58, supported a finding of disability. *Id.* at 944-45. That is, in reviewing the entire record, the ALJ determined the plaintiff was disabled. *Id.* The GAF scores were but one small part of a well-documented record of severe schizoaffective disorder, manic behavior, homicidal threats, paranoid delusions, and a complete denial of her serious illness. *Id.* at 938.

Since the decision in *Pate-Fires*, the Eighth Circuit has repeatedly upheld decisions to deny benefits for claimants with GAF scores below 50. *See, e.g.*, *Martise v. Astrue*, 641 F.3d

909, 919 (8th Cir. 2011) (GAF scores in the 40s and 50s); *Partee v. Astrue*, 638 F.3d 860, 862-63 (8th Cir. 2011) (GAF scores in the 30s); *Hurd v. Astrue*, 621 F.3d 734, 736 (8th Cir. 2011) (GAF scores of 30, 40, and 75); *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2011) (GAF scores in the mid-40s and low 50s).

Plaintiff argues that, by not discussing the history of low GAF scores, ALJ did not properly analyze Plaintiff's disability. Defendant, on the other hand, argues that because the treatment records indicated Plaintiff's level of functioning was higher than reflected in his GAF scores, the ALJ's decision was reasonable. The Court agrees with Defendant's reasoning.

First, the ALJ need not credit every piece of evidence submitted. *Wildman*, 596 F.3d at 966 (citation omitted). Further, even if the ALJ does credit a claimant's GAF scores, the ALJ may assign less weight to the scores if they are inconsistent with the medical record as a whole. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (giving less weight to GAF scores that are inconsistent with other medical evidence). Many of Plaintiff's lowest GAF scores came when he had ceased taking his medication and few GAF scores were assigned at other times, thereby skewing the average upon which Plaintiff relies. The ALJ reasonably relied on the medical evidence in the record as a whole and afforded that evidence greater weight. On the aggregate, the ALJ's opinion, despite his failure to discuss GAF scores, is supported by substantial evidence.

### B.     The ALJ Properly Credited Dr. Egan's Medical Opinions

Plaintiff next claims that the ALJ's decision is subject to reversal because the ALJ did not assign proper weight to the opinion of Dr. Timothy Egan, Plaintiff's treating physician. Generally, a treating source's opinion is entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2). To compel the assignment of controlling weight to a treating physician's

opinion, however, the opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in your case record." *Id.* If a treating source's opinion is inconsistent with the record as a whole or not well-supported, it is error to give the opinion controlling weight. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *2 (July 5, 1996).

Plaintiff highlights Dr. Egan's conclusion that "[Plaintiff] clearly is not going to be capable of maintaining competitive employment." Plaintiff further notes that Dr. Egan based that conclusion on Plaintiff's "significant psychiatric difficulties including attention deficit hyperactivity disorder, depressive disorder, psychotic features and borderline intellectual functioning." (R. at 827.)

The ALJ concluded that Plaintiff suffered a severe impairment based on impulse control, depressive disorder, ADHD, and personality disorder with antisocial and borderline features. While the ALJ did not explicitly cite the pages in the record on which Dr. Egan diagnosed Plaintiff with those impairments, the ALJ conclusively and explicitly agreed with Dr. Egan's diagnosis of Plaintiff's mental illnesses. Plaintiff points out that the ALJ dropped the words "significant" and "psychotic" from his decision. The omitted adjectives, however, do not require a finding that the ALJ did not accord appropriate weight in ruling on Plaintiff's application. It is clear that the ALJ credited Dr. Egan's opinions with regard to medical diagnoses.

Plaintiff argues that the ALJ was required to give controlling weight to Dr. Egan's ultimate conclusion that Plaintiff could not maintain competitive employment. The Court disagrees. An ALJ must give controlling weight to a medical opinion, but not to a provider's opinion that the patient is disabled. *Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010) (citing *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)). Under 20 C.F.R. § 404.1527(a) and

§ 416.927(a), medical opinions are "opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight." SSR 96-2p, 1996 WL 374188, at *2. Under the regulations, however, "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are *administrative findings that are dispositive of a case*; i.e., that would direct the determination or decision of disability."; SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) (emphasis added); *see also* 20 C.F.R. § 404.1527(e); § 416.927(e). One specifically listed example of a non-medical opinion is whether an individual is disabled under the Social Security Act. *Id.* Additionally, an opinion that an individual is "unable to work" is reserved to the Commissioner. *Id.* at *5; *see also Brown*, 611 F.3d at 952. When a physician gives an opinion on an issue reserved to the Commissioner, the opinion is not entitled controlling weight or any special significance. *Id.* While the Commissioner may not ignore that opinion, the Commissioner must determine disability based on the totality of the evidence. *Id.* at *2.

In this case, the ALJ relied on state agency physician opinions because they were consistent with the record as a whole. Contrary to Plaintiff's argument, reliance on state agency medical and psychological consultants is required by the regulations. SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). Further, the ALJ explained why he accorded weight to the state agency professional's opinions on which he relied, as required by the SSRs. *Id.*

On a review of the voluminous record, the ALJ parsed out the opinions that were supported by substantial evidence and credited them accordingly. The ALJ properly credited Dr. Egan's diagnosis of Plaintiff's multiple conditions and rightly did not give controlling weight to the nonmedical opinion that Plaintiff was incapable of working.

C.     The ALJ's Credibility Determination

Finally, Plaintiff argues the ALJ discounted Plaintiff's credibility because Plaintiff was not compliant with his medication. Plaintiff is correct in arguing that it is improper to consider a plaintiff's failure to comply with his medication regime if mental impairments cause the noncompliance. *See Pate-Fires*, 564 F.3d at 945. Still, it is the Court's role to review the entire record and Plaintiff devotes his entire argument regarding the ALJ's credibility determination to two non-conclusive sentences.

Presumably, Plaintiff's argument that the ALJ improperly considered Plaintiff's noncompliance in making his credibility determination is based on the following statements in the ALJ's opinion: "Furthermore, as discussed in detail above, there is evidence that claimant is not compliant with his prescribed treatments. It has been noted numerous times in the record that claimant is not compliant with his medications." (R. at 18) (citations omitted). However, the immediately preceding paragraph supplies the context of those sentences. The ALJ noted:

> In assessing the claimant's credibility, the undersigned has considered his work history. . . . The undersigned . . . notes that the claimant has provided inconsistent information regarding his work activities and symptoms. Claimant testified he last worked in 2001. However, on January 16, 2004, claimant stated that "his boss paid $700 dollars to get him out of jail." . . . Claimant testified that he can walk and stand for "a couple of minutes" and can only lift one gallon of milk before he feels pain in his back. However, on July 15, 2008, claimant reported that he was helping his family build a deck. . . . Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggested that the information provided by the claimant generally may not be entirely reliable.

(*Id.* at 17-18.) The proximity of the ALJ's reference to Plaintiff's noncompliance with his medication regime to the ALJ's discussion of Plaintiff's credibility does not compel the conclusion the ALJ based his credibility determination on Plaintiff's failure to comply with his medication regime. The record is rife with instances of exaggerated symptoms, nonexistent

symptoms, and positive mental status examinations (MSEs), including MSEs from Plaintiff's treating physician. The ALJ's credibility determination is supported by substantial evidence in the record.

"In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms . . . ." SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). In reviewing the entire record, it is clear that Plaintiff's self-reports were unreliable. Plaintiff repeatedly reported that he had diabetes, was diagnosed with hypochondriasis, admitted to exaggerating claims "for attention," and expressed that his motive for certain doctor's visits was to appear ill for SSI purposes. The Social Security Administration has advised that consistency, both internally and with the case record, is an indication of an individual's credibility. *Id.* at *5.

When the Court combines the quoted passage, above, with the recitation of the numerous times that Plaintiff noted he wanted to begin seeing more doctors to strengthen his case for SSI, and similar comments, there is overwhelming evidence in the record to support the ALJ's credibility determination. The Eighth Circuit has mandated that reviewing courts give deference to an ALJ's decision regarding credibility if that decision is supported by the evidence. *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008). Accordingly, the Court finds there is substantial evidence in the record to support the ALJ's credibility determination.

## IV.  CONCLUSION

Upon reviewing the administrative record, the Court agrees with the ALJ that Plaintiff is mentally impaired to some extent. Someone whose mind was 100 percent sound would not

engage in some of the activities in which Plaintiff has engaged. Hitting one's head into a wall and disclosing one's ulterior motives for seeking medical treatment are just a few things Plaintiff has done that indicate a serious mental condition. The legal reality, however, is that there is substantial evidence in the record to support a finding that Plaintiff's condition does not rise to the level of "disabled" as defined by the Social Security Act and the regulations arising thereunder. Further, the standard of review affords the administrative judge a very high degree of deference. Plaintiff falls within the "zone of choice" in which there is substantial evidence to support a finding of disability or non-disability. However, the Court is satisfied that each conclusion reached in the ALJ's decision is supported by substantial evidence in the record as a whole.

## V.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 11) be **DENIED**; and

2.      Defendant's Motion for Summary Judgment (Doc. No. 13) be **GRANTED**.


Dated:  September 30, 2011              _s/ *Jeanne J. Graham*_____
                                        JEANNE J. GRAHAM
                                        United States Magistrate Judge

### NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **October 17, 2011**. A party may respond to the objections within fourteen days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made. The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the district judge is not required to review a transcript or the district judge directs otherwise.